Wade H. Ballard II and Alice H. Ballard v. Commissioner.
Ballard v. Commissioner
Docket No. 4750-62.
United States Tax Court
T.C. Memo 1964-311; 1964 Tax Ct. Memo LEXIS 30; 23 T.C.M. (CCH) 1907; T.C.M. (RIA) 64311; November 30, 1964
*30 Petitioner held taxable on distributive share of partnership income attributable to a partnership interest he purportedly sold to a trust for his minor son. Thomas N. Chambers, Kanawha Valley Bldg., Charleston, W. Va., and Lee O. Hill, for the petitioners. Rodney G. Haworth, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax for the taxable years 1959 and 1960 in the amounts of $6,677.42 and $4,313.64, respectively. The issue for decision is whether Wade H. Ballard II was the owner of a partnership interest during the years in question so that the distributable share of partnership net income is taxable to him for those years. Other issues raised by the pleadings *31 have been settled by concessions of the parties. Findings of Fact Some of the facts have been stipulated and are found accordingly. Wade H. Ballard II, hereinafter referred to as petitioner, and Alice H. Ballard are husband and wife and were residents of Welch, W. Va., during the period in question. They filed joint income tax returns with the district director at Parkersburg, W. Va., for those years. Petitioner's only child was Harry H. Ballard, who was in his minority during the period involved. Petitioner has actively engaged in the practice of law in Welch, W. Va., since 1933, with the exception of 3 1/2 years which he spent in the armed forces during World War II. In the spring of 1946 petitioner and Joseph G. Hunt, as equal partners, formed a partnership known as Southern Distributors, hereinafter referred to as Southern. The partnership was conducted under an oral partnership agreement, no formal written partnership agreement having been executed. Southern engaged in the coin-operated music and vending machine business and in furtherance thereof placed machines which it owned in various locations. It regularly collected the proceeds from the machines and serviced *32 them when needed. Southern employed various persons to service and repair these machines. Petitioner and Hunt also performed services for Southern. From 1946 through 1949 petitioner kept some of the books and accounting records of the partnership, paid employees and suppliers, and purchased equipment. Hunt generally handled the placement of most of Southern's machines. This was facilitated by the fact that he was also a partner in a wholesale beer distributorship and had interests in other business enterprises, independent of the partnership, and used his business contacts gained through the beer distributorship as a basis for placing the vending machines. From 1950 through the years in question, the operations of the partnership consisted more in the maintenance and servicing of its machines, and most of this work was performed by employees of the partnership. The business was managed by Hunt. By 1950 petitioner had ceased performing any services for Southern and devoted most of his business time to the practice of law. On April 1, 1958, petitioner purported to sell his interest in Southern to a trust established simultaneously therewith for the benefit of petitioner's minor *33 son, Harry. There was nothing in writing to evidence the transaction except a note hereinafter mentioned. The trustee of such trust was Arnold H. Broyles who was cashier of the First National Bank of Peterstown in Peterstown, W. Va. Broyles was a personal friend of petitioner but was in no way related to him or his son. Broyles received no compensation or salary in his capacity as trustee. The trust corpus purportedly consisted of the partnership interest only; there was no cash fund transferred. The purpose for the arrangement was to provide Harry with an estate and funds with which to attend medical school in the most practical way possible. Broyles, as trustee, purported to purchase the partnership interest for $40,000 by tendering a nonnegotiable promissory note to petitioner in the face amount of $40,000 with interest at 5 percent per annum payable $5,000 on January 1, 1959, and $5,000 on the 1st of every year thereafter until paid in full. Petitioner received no security for the note. There were no written documents evidencing either the sale, the terms of the trust, or the fiduciary duties of the trustee. No written partnership agreement was executed by Hunt and the trustee *34 from April 1, 1958, to January 1, 1959. Broyles, as trustee, performed no services for Southern and made no inquiry about, and had no knowledge of, the operations of Southern; nor did he examine its books and records. The trustee did perform some services on behalf of the trust such as maintaining a bank account for the trust funds, receiving partnership income, disbursing money on behalf of the trust and making an accounting to the County Court of Monroe County, W. Va., concerning receipts and disbursements therefrom for the period January 14, 1959, through August 23, 1963. In addition, the trustee paid premiums on two life insurance policies on the life of Harry Ballard purchased by Wade Ballard sometime prior to 1958. The owner of these policies was Harry Ballard and the beneficiary under each policy was petitioner and/or his wife. The report of the trustee, filed September 23, 1963, reported no original corpus, reported receipts from Southern and small amounts from local gas companies, and reported disbursements to petitioner, the director of internal revenue, and to the two insurance companies which issued the policies mentioned above. It reported no disbursements to Harry and *35 there appear to have been no investments made until August 23, 1963, when the balance of cash on hand in the amount of $9,917.26 was deposited in a savings account. The total receipts from January 14, 1959, to August 23, 1963, were reported as $47,934.39, $41,334.79 of which was from Southern, and total disbursements were reported as $38,017.13, $28,000 of which was to petitioner [1] and $9,665.48 of which was to the director of internal revenue. During 1959 and 1960 after petitioner purportedly transferred his interest in the partnership to the trust, he performed no services for the partnership and received no remuneration therefrom. On occasions he did discuss the partnership affairs with Hunt. Payments on the note *36 representing the purchase price of the partnership interest owed petitioner by the trust were made from the income received by the trustee from the partnership. Neither the trust nor Harry had any other funds with which to make the payments. Except for the first payment the payments were in irregular amounts and most of them were delinquent. Interest on the note was waived entirely by petitioner. Notations on the note made by petitioner indicate that payments were made to petitioner as follows: Jan. 30, 1959
$ 5,000
July 8, 1960
3,000
Apr. 10, 1961
8,000
Aug. 23, 1963
10,000
Jan. 17, 1964
14,000
On or about January 1, 1959, Hunt and the trustee, on behalf of the trust, each sold a one-eighth interest in Southern to Edgar F. Hendricks and Joe T. Bise, respectively. The two purchasers were the principal employees of the firm at the time of the sale and remained in such capacity thereafter. In consideration for the one-eighth interest in the partnership which each received, Bise and Hendricks executed promissory notes in the fact amount of $8,125, bearing interest at 6 percent per annum. By written instrument dated January 1, 1959, Hunt, Broyles, as trustee *37 for Harry H. Ballard, Bise, and Hendricks entered into a partnership agreement under the firm name of Southern Distributors for the purpose of engaging in the coin-operated machine business. The initial capital was stated to be $65,000 and the net income of the partnership was to be divided 37 1/2 percent to each of Hunt and the trustee, and 12 1/2 percent to each of Bise and Hendricks. Hunt was designated general manager and was given control over the purchase of additional equipment and the hiring and firing of employees. During the years of its operation, Southern operated at a profit. Petitioner, who reported income on a cash basis, reported income from Southern on his 1956 and 1957 tax returns in the amounts of $13,992 and $15,946.92, respectively. The net profit of Southern for the years 1958, 1959, and 1960, as reported on its partnership returns of income, was $32,017.92, $26,281.87, and $24,937.86, respectively. In their joint income tax returns for 1959 and 1960, petitioner and his wife reported no income from the partnership and no gain from the alleged sale thereof. In addition they reported no gain on the sale of a one-eighth interest in Southern in 1959. In his *38 notice of deficiency for these years, respondent determined that petitioner still owned an interest in Southern and that a corresponding share of distributable partnership income for each of the respective years was includable in his taxable income. In addition, respondent determined that the long-term capital gain on the sale of the one-eighth interest in Southern was taxable to petitioner on the theory that he owned the one-half interest just prior to sale. In the alternative, respondent determined that if there was a valid sale of petitioner's interest in the partnership, petitioner received ordinary income in each of the years in the amount of $3,522.11 and $2,113.26, respectively, which represented interest on the outstanding debt owed petitioner by the trust. Opinion The issue as framed by the pleadings is whether petitioner actually made a valid sale of his 50-percent interest in Southern Distributors, a partnership, to a trust he established for his minor son so that the trust must be considered the owner of the partnership interest and thus taxable on a proportionate share of the partnership income rather than petitioner. If we find that petitioner continued to be the *39 owner of the partnership interest the parties agree that the allocable share of partnership net income as determined by respondent for the years in question and gain on the sale of a one-eighth interest in the partnership in 1959 is taxable to petitioner. Respondent has not attacked the validity of the trust, and both parties concede that section 740(e), I.R.C. 1954, relating to the creation of family partnerships, has no application here because either the father or the trust for his son is a partner with unrelated individuals, but not both. In his notice of deficiency, respondent determined that the interest in the Southern Distributors partnership allegedly owned by Arnold H. Broyles as trustee for petitioner's son was in fact owned by petitioner and that petitioner was taxable on a distributive share of the partnership income. This determination is presumed to be correct and petitioner has the burden of proving that it was erroneous. Inasmuch as this is not a family partnership case and hence section 704(e) of the Code is not directly involved, we must determine the issue before us under the general principles established by case law. However, we agree *40 with petitioner that the framework within which this issue is to be decided is well stated by the Senate report accompanying the Revenue Act of 1951 (S. Rept. No. 781, 82d Cong., 1st Sess., p. 39 (1951), 1951-2 C.B. 458, 486) by which the family partnership provisions were added to the 1939 Code, wherein it is stated (pp. 39, 40): The amendment leaves the Commissioner and the courts free to inquire in any case whether the donee or purchaser actually owns the interest in the partnership which the transferor purports to have given or sold him. Cases will arise where the gift or sale is a mere sham. Other cases will arise where the transferor retains so many of the incidents of ownership that he will continue to be recognized as a substantial owner of the interest which he purports to have given away, as was held by the Supreme Court in an analagous trust situation involved in the case of Helvering v. Clifford 309 U.S. 351). The same standards apply in determining the bona fides of alleged family partnerships as in determining the bona fides of other transactions between family members. Transactions between persons in a close family group, whether or not involving *41 partnership interests, afford much opportunity for deception and should be subject to close scrutiny. All the facts and circumstances at the time of the purported gift and during the periods preceding and following it may be taken into consideration in determining the bona fides or lack of bona fides of a purported gift or sale. However, we disagree with petitioner on the conclusion to be reached from applying the evidence presented to the above principles. We are also faced here with the basic general principles that the fruit must be attributed to the tree on which it grew, Lucas v. Earl, 281 U.S. 111 (1930), and that income from personal services is attributable to the person rendering the services. Poggetto v. United States, 306 F. 2d 76 (C.A. 9, 1962). And while we are not directly concerned with the validity of the partnership involved, nevertheless, the requirement that a partner contribute either capital or services must necessarily enter into our inquiry as to which of these entities, petitioner or the trust, was the real partner in Southern. Southern was a partnership in which petitioner and Hunt had been equal partners since 1946. There was *42 no written partnership agreement and there is no evidence of the terms of the partnership. It was engaged in the business of owning and operating coin-operated machines such as "juke" boxes and pinball machines. While petitioner had performed some services for the business prior to 1950, after that time he performed few or no services for the business, and the business was managed and operated by Hunt and two principal employees. There is no evidence that petitioner and Hunt contributed any additional capital to the partnership after their initial contributions, the amount of which is unknown, all additional equipment used in the business apparently having been bought out of earnings. Good locations for the machines apparently contributed most to the success of the business, and good servicing of the machines was also an important factor. The latter was performed by employees. According to the partnership return of income for 1958 the assets of the partnership at the beginning of 1958 consisted of cash in the amount of $2,528.95, accounts receivable in the amount of $2,915, and depreciable assets, consisting mostly of coin machines and a small truck, having a depreciated basis of $19,822. *43 85. The partners' capital accounts totaled $12,633.40 each. The above was about the situation on April 1, 1958, when petitioner purportedly sold his entire interest in the partnership to a trust established for the benefit of his son Harry, who was at that time 13 years of age, for $40,000, payable over 8 years. So far as we know, Harry had few if any assets of his own at that time, and the trust had none. Looking at the evidence more favorable to petitioner we have the oral testimony of petitioner that he established the trust for his son, and sold his interest in the partnership to the trustee for the purpose of providing Harry with an estate and income to enable him to obtain a medical education. There was no written trust agreement and we have no evidence of the terms of the trust except that it was to terminate when Harry became 21 years of age. There was no written partnership agreement entered into between the trustee and Hunt. The only written evidence of the transaction is a note dated April 1, 1958, signed by Arnold H. Broyles, trustee for Harry Ballard, in his capacity as trustee only, in the face amount of $40,000, payable to petitioner at the rate of $5,000 on the *44 1st day of 1959 and on the 1st of each year thereafter until paid in full, at 5 percent interest. The evidence indicates that payments in odd amounts were made on the note in each of the years 1959, 1960, 1961, and 1963 and that it was paid in full on January 17, 1964, with a payment of $14,000. No interest was paid on the note. In addition, a written partnership agreement was entered into as of January 1, 1959, between Broyles as trustee, Hunt, Hendricks, and Bise, the latter two being the principal employees of Southern, whereby the parties agreed to engage in the coin-operated machine business as partners, under the name of Southern Distributors, beginning January 1, 1959, in Welch, W. Va., with a capital of $65,000, the net income of the partnership to be divided 37 1/2 percent to each of Broyles, as trustee, and Hunt, and 12 1/2 percent to each of Hendricks and Bise. The latter two agreed to apply their entire shares of the net partnership income to the curtailment of two $8,125 notes made by them payable to Broyles, trustee, and Hunt, until paid in full. Provision was made for the disposition of each partner's interest in the event of his death or withdrawal, the interest of *45 the trustee or Harry Ballard to "descend" to the mother and father of Harry. Hendricks and Bise agreed not to compete in the event they withdrew from the partnership, and Hunt was designated general manager with full control over the purchase of additional equipment and the hiring and firing of employees. For the years 1959 and following, the partnership returns reported the partners to be Hunt, Harry Ballard, Hendricks, and Bise. On September 23, 1963, Arnold H. Broyles, trustee for Harry Ballard, filed with the County Court of Monroe County, W. Va., a report accounting for his receipts and disbursements as trustee from January 14, 1959, through August 23, 1963, in which he reported "dividends" received from Southern Distributors and several small gas companies and disbursements made to petitioner, the director of internal revenue, and two insurance companies. The balance shown to be held by the trustee as of August 23, 1963, was $9,917.26, which was at that time deposited in a savings account. We also have in support of petitioner's position the testimony of Hunt who said that he was advised by petitioner that petitioner was going to sell his interest in the partnership to a *46 trust for his minor son, that he (Hunt) was willing to have the trustee become a 50-percent partner, even though the trustee had no other assets, because he did not believe the business would need additional capital and that it would go on just as it had in prior years. On the other side of the coin and supporting respondent's position are the facts that there was no written evidence of the sale of the partnership interest by petitioner to the trust, there was no written trust agreement between Hunt and the trustee indicating that they had entered into partnership. There is no written evidence of the terms of sale, except the note above mentioned, and there is no evidence of the terms of the trust except that it was to expire when Harry became 21 years of age. Neither the trustee nor Harry, who was 19 years old at the time of trial and a student at North Carolina University, were called as witnesses to verify petitioner's unsupported testimony that there was in fact a sale of a partnership interest. The trustee's report of September 23, 1963, shows only cash receipts and disbursements starting on January 14, 1959. It does not indicate that there were any assets or trust corpus on *47 hand prior to January 14, 1959. There is no written evidence of a transfer of either a partnership interest or of partnership assets. For all we know petitioner could have had complete control of the trust, with the right to terminate it and take over its assets at any time. The evidence is that the trustee made disbursements of trust funds at the direction of petitioner. The trustee took no active part in the partnership affairs and whenever Hunt wanted to consult anyone concerning the affairs of the partnership he continued to consult petitioner. In addition the trustee apparently filed no fiduciary tax returns. Returns were filed for Harry Ballard, individually, wherein it was reported that he received income direct from Southern Distributors, with no mention of a trust. The partnership returns for 1959 and following reported Harry Ballard as a partner, but not the trustee. None of the returns for petitioner for the years 1958, 1959, and 1960 made any mention of a sale of a partnership interest, nor did the returns filed for Harry Ballard for the years 1959 and 1960 report the sale of a one-eighth partnership interest to Hendricks and Bise. The partnership agreement dated January 1, 1959, and *48 signed by the trustee proves little more than that the trustee entered into a partnership agreement with Hunt, Hendricks, and Bise starting January 1, 1959. There are also inconsistencies in some of the documentary evidence that cast doubt on petitioner's claim that he made a bona fide sale of his partnership interest to the trust on April 1, 1958. The partnership return for 1958 reports capital accounts at the beginning of the year for Hunt and petitioner, and none for Harry Ballard. The income is shown as being distributable one-half to Hunt, one-eighth to petitioner, and three-eighths, or $12,006.72, to Harry. Petitioner is reported as having withdrawn slightly more than his share of the earnings, but is shown as having a balance in his capital account at the end of the year of $11,823.14 - after he purportedly sold his entire interest. On the other hand Harry is reported as having made no withdrawals in 1958 and as having a balance in his capital account at the end of the year in the amount of $12,006.72, the exact amount of his share of the earnings for that year. If petitioner sold his partnership interest to the trustee or Harry, why would they have not taken over his capital *49 account, which represented one-half of the total assets of the business at the beginning of the year and over one-fourth of the total assets at the end of the year? Also it is difficult to reconcile the balance sheet of the partnership at the end of the year 1958, as shown on its 1958 return, with its balance sheet as of the beginning of the year 1959, as shown on its 1959 return. The total of the partners' capital accounts at the end of 1958 was $43,659.72 while the beginning capital accounts in 1959 totaled $65,000, with Harry's account increasing from $12,006.72 to $24,375. We have no evidence that Harry or the trustee had any funds which were or could have been contributed to the partnership at the beginning of 1959. Nor does the trustee's accounting of receipts from Southern reconcile with the withdrawals shown by the partnership returns to have been made by Harry. The trustee's report shows receipts of $16,888.79 from this source in 1959; the partnership return shows withdrawals of $9,855.69. The trustee reports no receipts from this source in 1960; the partnership return reports withdrawals of $2,166. Based on the above evidence and the record as a whole we are not convinced *50 that petitioner has established that he sold a partnership interest to a trust for Harry. We are rather doubtful that the evidence supporting petitioner's position, when viewed in the light of petitioner's self-interest and apparent control over the trustee, is sufficient to establish a prima facie case offsetting the presumptive correctness of respondent's determination; but when we analyze the evidence as a whole we believe it more readily supports the conclusion that petitioner simply assigned to Broyles, as trustee for petitioner's son, the right to receive petitioner's share of the partnership income. Neither Harry nor the trustee contributed any services or original capital to the partnership. The only capital available to either of them was the income from the partnership. This was the only source to which petitioner could have looked for his purchase price and we do not believe petitioner would have transferred his interest in the partnership for a nonnegotiable note payable only from such source in an arm's-length transaction or a bona fide sale. Petitioner appears to have been in much the same position with respect to this partnership interest after April 1, 1958, as he was *51 before that time, except that a distributive share of the partnership income was being reported for tax purposes by Harry rather than petitioner. However, most of these funds were paid over to petitioner ostensibly as the purchase price of the partnership interest. Transactions between members of a family must be scrutinized closely to determine that they are in reality what they purport to be, rather than a mere shifting of income for tax advantages. Transactions between a father and a trust for his minor son have been found to be inoperative for tax purposes even when evidenced by carefully drawn written instruments reciting the terms of the sale and of the trust. Roy C. Acuff, 35 T.C. 162 (1960), affirmed per curiam 296 F. 2d 725 (C.A. 6, 1961). Where such a transaction is intended to be bona fide and binding we think a prudent person, particularly a succesful lawyer such as petitioner, would document it with considerably more independent evidence than presented here. While we have no quarrel with petitioner's motive, we do not believe he can escape taxation on this income for the years here involved by a transfer no more definite nor binding than this *52 one has been shown to be by the evidence presented here. We find for respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. The amount of $28,000 reported in the accounting as having been paid to petitioner includes a payment of April 10, 1961, in the amount of $10,000. Receipts as reported in the accounting equal disbursements as reported, plus the amount shown on deposit in a savings account. The parties have stipulated that the payment of April 10, 1961, to petitioner was in the amount of $8,000, rather than $10,000. The resulting discrepancy in the accounting is unexplained.↩